2022 IL App (1st) 200663-U

SIXTH DIVISION
March 18, 2022

No. 1-20-0663

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 3039 01 |
| | ) | |
| JESUS VEGA, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justice Harris concurred in the judgment.
Presiding Justice Pierce dissented.

**O R D E R**

¶ 1    *Held*:   We reverse the circuit court's denial of the defendant's *pro se* motion for leave to file a successive postconviction petition alleging his *de facto* life sentence of 75 years, for a murder committed when he was 19 years old, violates the proportionate penalties clause of the Illinois Constitution. Having alleged sufficient preliminary facts related to his individual characteristics to suggest he was more like a juvenile than an adult at the time he committed his crime, defendant established the requisite cause and prejudice to warrant granting him access to the postconviction process, where he can further substantiate his claim at a second-stage hearing.

¶ 2    Following a jury trial in 2006, Jesus Vega was convicted of first-degree murder and sentenced to 75 years in prison. In 2019, Mr. Vega filed a motion for leave to file a successive

postconviction petition, asserting that as applied to him, his lengthy sentence, imposed for an offense committed when he was just 19 years old, violates the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. The circuit court denied his motion, concluding he failed to satisfy the cause and prejudice test, a prerequisite for the filing of successive postconviction petitions in non-innocence cases. Mr. Vega now appeals that denial. For the reasons that follow, we reverse and remand this matter for a second-stage evidentiary hearing where Mr. Vega can further develop his proportionate penalties claim.

¶ 3                                   I. BACKGROUND

¶ 4                                   A. The Trial

¶ 5      Jesus Vega was tried and convicted for the murder of a man named Jose Soto who, on December 29, 2003, was shot and killed outside of a bar on Chicago's northwest side. As Mr. Vega challenges his sentence, not his conviction, our summary of the facts will be brief.

¶ 6      At Mr. Vega's trial, the key witness was Rosalee Soto, the victim's wife. She testified that sometime after 11:00 p.m. that night, she drove to a bar where her husband was socializing to drop off some cash she had taken out of an ATM for him. When she arrived at the bar, her husband came outside, walked over to her vehicle, and spoke to her through the passenger side window. After a brief conversation, she started to drive away.

¶ 7      Mr. Soto turned and started walking back towards the entrance of the bar, at which point Ms. Soto heard a gunshot. She then saw her husband take off running. Another man, who was wearing a gray hoodie and standing about four feet from her husband, began chasing him down the sidewalk. The man in the hoodie then stopped a few feet away from Ms. Soto's car, made eye contact with her, and fired four to five more shots at Mr. Soto. Terrified that she would be the next target, Ms. Soto tried to drive away from the gunman. As she sped away from the scene, her

husband, bleeding profusely, climbed into the car through the passenger door.

¶ 8    Racing toward the hospital in a state of panic, Ms. Soto crashed into another vehicle. Eventually, an ambulance came to take Mr. Soto to a nearby hospital, where he died of his injuries. Police officers then arrived at the scene of the crash, and Ms. Soto provided them with a brief statement and a description of the shooter. When it became apparent that she too needed medical attention for injuries stemming from the car crash, she was also taken to a nearby hospital.

¶ 9    A few weeks later, on January 10, 2004, Ms. Soto went to a police station to view a lineup. She instantly identified Mr. Vega as the man in the gray hoodie who had killed her husband. She reaffirmed this identification in the courtroom at trial.

¶ 10    After hearing damaging testimony from several other witnesses—including Mr. Vega's step-cousin, who testified that on the night of the murder, she and her brother had loaned a gray hoodie to Mr. Vega—the jury found Mr. Vega guilty of first-degree murder.

¶ 11    The jury also found that Mr. Vega possessed or discharged a firearm during the commission of the offense, meaning that in addition to the mandatory 20-to-60-year base sentence he would receive for the murder conviction, he would also be subject to a mandatory firearm enhancement of 25 years to life. Thus, the statutory minimum Mr. Vega could receive at sentencing would be 45 years.

¶ 12                    B. Sentencing

¶ 13    According to a presentencing investigation (PSI) report, Mr. Vega was the eldest of three children born to a single mother who worked as a nurse's aide. He had never met his father. He described his childhood as "normal" and denied any family history of physical, mental, sexual, or substance abuse. He also reported no personal history of mental illness or mental health treatment. The PSI report stated that Mr. Vega had stopped attending school after completing seventh grade.

Mr. Vega also admitted to being a member of the "Maniac Latin Disciples" street gang since 1997, though he denied having any particular role or rank within the gang structure. The report also noted a number of juvenile adjudications on his record—for robbery, gang recruitment, burglary, possession of a controlled substance, and unlawful use of a weapon (UUW)—as well as an adult UUW conviction.

¶ 14    A sentencing hearing was held on January 19, 2006. The State asked the court for a term of between 45 years and natural life, arguing that after examining Mr. Vega's juvenile record and considering his background, "there is no reason or justification or excuse for this shooting. There's nothing other than *** what it was which was pure violence ***."

¶ 15    In mitigation, the defense argued that even though the PSI report stated that Mr. Vega described his childhood as "normal," the fact that he stopped attending school in the seventh grade revealed a total lack of support and an absence of positive family role models in his life:

"What kind of parents, what kind of home life, what kind of adult role model could possibly have allowed him to be what he became. ***

Judge, I just submit to the Court that I think all of us could agree that no father, a mother who let her son stop going to school at 7th grade, a mother who allowed it to happen that he never attended a day of high school, his home life wasn't fine.

No question about it he's a child of the streets. *** That's where he grew up. The streets created him and made him what he is, and there was no one to stop it."

After noting how at no point during the trial had any member of Mr. Vega's family appeared in the courtroom to show their support for him, the defense concluded by asking the court for a sentence of 45 years, the statutory minimum.

¶ 16    The court then issued its sentence, stating:

"When I look at matters in mitigation, particularly from the pre-sentence report, his background does not appear to give any reason for the conduct, the criminal conduct that followed later in his life.

He was raised on the northwest side by his mother and his mother alone, the eldest of three siblings; what he characterizes as a normal childhood, no hint of abuse, any type of abuse. What he calls a close relationship, family relationship was maintained.

It is true that he has very little in the way of education. He finished grade school while in custody, no high school attendance at all, no employment history, simply supported by his mother. No indication of alcohol or drug addiction or mental problems. He was a self admittedly [*sic*] a member of the Maniac Latin Disciples since 1997.

When I look at other factors in mitigation, I cannot say from anything in this record before me that bodily harm, serious bodily harm was not contemplated, threatened. In fact, it was caused. And while that's implicit with any homicide case, the manner of death is certainly a factor that the Court can consider, and none of it speaks well for Mr. Vega.

There's no hint of any provocation from this evidence, justification, excuse, any explanation other than unreasonable ones which the court certainly cannot fathom from this evidence.

And there is no, particularly today after what the Court has heard, certainly no indication to this Court that this type of situation would not recur in the near future, in any future if Mr. Vega was again restored to society and able to live freely among civilized members of society."

Describing the murder of Mr. Soto as "an execution" and concluding that "this defendant has been a danger in this particular community to other persons other than the one who lost his life," the

court imposed a sentence of 75 years.

¶ 17                                    C. Subsequent Procedural History

¶ 18    Mr. Vega filed a direct appeal (case No. 1-06-0629), and this court issued an order granting an agreed motion for summary disposition and directing the circuit court clerk to issue a corrected mittimus reflecting that Mr. Vega was entitled to 740 days of pretrial custody credit.

¶ 19    On March 24, 2008, Mr. Vega filed an initial postconviction petition asserting various claims for relief. On May 30, 2008, the circuit court issued an order summarily dismissing the petition, finding it frivolous and patently without merit. This court then affirmed that summary dismissal. *People v. Vega*, 393 Ill. App. 3d 1105 (2009) (table) (unpublished order under Supreme Court Rule 23).

¶ 20                                    D. Mr. Vega's Successive Petition

¶ 21     On September 23, 2019, Mr. Vega filed the *pro se* motion seeking leave to file a successive postconviction petition that is the subject of this appeal. In that motion and attached petition, Mr. Vega argued that his *de facto* life sentence of 75 years, imposed for a crime committed when he was just 19 years old, violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution "where his sentencer failed to take into account the hallmark features of youth as now required by the U.S. Supreme and Illinois Courts." (referring to *Miller v. Alabama*, 567 U.S. 460 (2012) and its Illinois progeny, specifically *People v. House*, 2015 IL App (1st) 110580, *vacated*, 2019 IL App (1st) 110580-B and *People v. Harris*, 2018 IL 121932).

¶ 22    Mr. Vega further argued that he satisfied the gateway "cause and prejudice" standard required to be granted leave to file his successive petition because his claim was "based on law that was not in existence at the time he filed his earlier petition" and that "his claim involved a

constitutional error so serious that his sentencing process violates due process." Mr. Vega included details in the petition about his childhood, highlighting that he was "raised in a single-parent household, his first contact with law enforcement was at age 11" and that "at the age of 13, he was sent to Illinois Youth Center, where he graduated from the eighth grade." He further noted that during his time in juvenile detention, "due to his inability to adjust," he was placed on psychotropic medication and that this medication "was not continued, nor did he receive any follow-up counseling" upon his release. He did not specify which medications he was prescribed, nor he did attach any documents or medical records substantiating these claims.

¶ 23    On January 10, 2020, the circuit court issued an order denying Mr. Vega's motion for leave to file a successive petition, explaining that while Mr. Vega had adequately demonstrated cause— as his claim was rooted in caselaw decided in the years after the filing of his initial petition—he had failed to establish that he suffered any prejudice from the inability to bring the claim sooner.

¶ 24    In the court's view, Mr. Vega failed to show prejudice because the primary case he relied on to establish his claim, *People v. House*, 2019 IL App (1st) 110580-B, did not apply to him based on key distinguishing facts. In *House,* this court held that the imposition of a mandatory life sentence on a 19-year-old convicted of murder under an accountability theory (we noted that the defendant in that case "merely acted as a lookout"), "shocked the moral sense of community, and thus violated the Proportionate Penalties Clause of the Illinois Constitution." *Id.* at ¶ 26. Rejecting any comparison between Mr. Vega and the defendant in *House*, the court explained:

> "[t]he only similarity the two have is that they were both the age of 19. These cases are not analogous to one another, the court in *House* focused on how less culpable the defendant was in the commission of the crime. [Mr. Vega], in contrast, was the most culpable actor in the commission of the crime."

¶ 25    The court also found Mr. Vega's allegations about his history of mental illness to be conclusory, unsupported, and even contradicted by the existing record. Further, revisiting the transcript from the original sentencing hearing, the court found that "the trial court took into consideration various factors that are aligned with the requirements in emerging case law," before concluding that "[w]hen a court takes into account these considerations, a life sentence without parole has been determined to be acceptable" (citing *People v. Holman*, 2017 IL 120655, ¶ 46). On these grounds, the court denied Mr. Vega leave, a decision which he now appeals.

¶ 26                                    II. JURISDICTION

¶ 27    The circuit court denied Mr. Vega's motion for leave to file a successive postconviction petition on January 10, 2020. On May 6, 2020, this court allowed Mr. Vega to file a late notice of appeal and ordered the appointment of the Office of the State Appellate Defender to represent him on this appeal. We thus have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 606 (eff. July 1, 2017) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 28                                    III. ANALYSIS

¶ 29    The Post–Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq.* (West 2018)) establishes procedures by which a criminal defendant may challenge his conviction or sentence based on a substantial deprivation of his state or federal constitutional rights. 725 ILCS 5/122–1(a)(1) (West 2018); *People v. Caballero*, 228 Ill. 2d 79, 83 (2008). A postconviction proceeding is a collateral attack on the trial court proceedings. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Its scope is limited to constitutional issues that were not, and could not have been, previously adjudicated. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). Claims that were decided on direct

appeal or in an earlier postconviction proceeding are generally barred by the doctrine of *res judicata*, and claims that could have been, but were not, raised in an earlier proceeding are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005).

¶ 30    Crucially, the Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-1(f) (West 2016). Successive petitions are disfavored, and, as our supreme court explained in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002), this strict statutory bar is only relaxed when "fundamental fairness so requires." For petitioners like Mr. Vega, who are not asserting an actual innocence claim, the only way to overcome this significant procedural hurdle is to demonstrate "cause and prejudice" for failing to raise a claim earlier. *Id.*; *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23.  Before we can discuss the central issue in this case—whether Mr. Vega demonstrated cause and prejudice—we first review some of the recent caselaw he relies on to state his claim.

¶ 31                    A. Mr. Vega's As-Applied Proportionate Penalties Claim

¶ 32    On appeal, Mr. Vega claims that, as applied to him, a 75-year *de facto* life sentence, imposed for a crime committed when he was just 19 years old, violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). In support of this argument, Mr. Vega relies on recent caselaw governing the sentencing of juvenile and young-adult offenders. This caselaw, briefly summarized below, has without a doubt evolved considerably since Mr. Vega was originally sentenced in 2006.

¶ 33    In *Miller*, 567 U.S. at 479, the United States Supreme Court held that in all but the rarest of circumstances where a crime reflects "irreparable corruption," "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." See also *Montgomery v. Louisiana*, 577 U.S. 190, 206-11 (2016) (revisiting the Court's decision in *Miller* and characterizing it as a new substantive constitutional rule that must be applied

retroactively on state collateral review). In arriving at and in applying this new substantive rule, "the [] Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58.

¶ 34    In the aftermath of *Miller*, the Illinois Supreme Court has gone further than the United States Supreme Court in protecting juveniles and young adults from what can be characterized as life sentences in at least two ways. First, it has interpreted the *Miller* rule to apply to all types of juvenile life sentences, whether they are actual or *de facto*, mandatory or discretionary. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10; *People v. Holman*, 2017 IL 120655, ¶ 40. The contours of this substantive rule then came into sharper focus in *People v. Buffer*, 2019 IL 122327 ¶¶ 27, 40-41, when our supreme court defined a *de facto* life sentence for a juvenile as any sentence requiring more than 40 years of imprisonment.

¶ 35    Second, the Illinois Supreme Court has also shown an increasing willingness to depart from limiting these considerations to defendants under the admittedly arbitrary age of 18. The proportionate penalties clause of our state constitution, Ill. Const. 1970, art. I, § 11, whose purpose is "to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship," has provided the ideological foundation for this departure. *People v. Carrasquilllo*, 2020 IL App (1st) 180534, ¶ 89.

¶ 36    By way of the proportionate penalties clause, our supreme court has held that emerging adults—at least those who were 20 years of age or younger at the time of their crimes—may also rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support *as-applied* challenges to life sentences. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (noting that a defendant, who was 19 years old at the time of his crime, could not bring such a claim for the first time on direct appeal but was "not necessarily foreclosed" from asserting it in

postconviction proceedings); *Harris*, 2018 IL 121932, ¶ 48 (concluding that the as-applied, youth-based sentencing claim of a defendant who was 18 at the time of his crime, was "more appropriately raised" in postconviction proceedings). Recently, in *People v. House,* 2021 IL 125124, ¶¶ 29-31, our supreme court reaffirmed that a young adult postconviction petitioner, 18 or over, can make an as-applied challenge under the proportionate penalties clause based on a developed evidentiary record as to how the "science concerning juvenile maturity and brain development applies equally to young adults, or to petitioner specifically."

¶ 37    In opening this door, our supreme court has accepted the possibility that an individual like Mr. Vega may be able to demonstrate through an adequate factual record that at the time he committed his crime, specific characteristics made him the functional equivalent of a juvenile, such that a *de facto* life sentence, imposed without the sentencing judge considering the safeguards established in *Miller*, violates the Illinois constitution because it is "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 38    This recognition that individuals 18 and older at the time of their crimes should not necessarily be treated as adults for sentencing purposes is supported by recent scientific literature, which has found that "during emotionally charged situations, late adolescents (ages 18-21) respond more like younger adolescents (ages 13-17) than like young adults (22-25) due to differences in brain maturation." Center for Law, Brain & Behavior at Massachusetts General Hospital, White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers (Jan. 27, 2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/. This recognition is also reflected in the recent parole provision using the age of 21 as a cutoff. See P.A. 100-1182, §5 (eff. June 1, 2019) (now section 5-4.5-115 of the Illinois Unified Code of Corrections

(730 ILCS 5/5-4.5-115) (West 2020)).

¶ 39    This law—which marked the first expansion of eligibility for discretionary parole in Illinois since our state's parole system was effectively abolished in 1978—established a new process by which those incarcerated individuals "*under the age of 21* at the time of the commission of an offense" will now be able to petition the Prisoner Review Board (PRB) to be released on parole after serving a minimum sentence. 730 ILCS 5/5-4.5-115 (West 2020) (emphasis added). Under this new regime, individuals like Mr. Vega who are convicted of a murder committed before they turned 21 will now be eligible for parole review after serving 20 years. *Id.* The law, however, expressly applies only to those "sentenced after June 1, 2019," meaning that unlike those being sentenced today, Mr. Vega will have no equivalent opportunity to eventually go before the PRB and demonstrate that his actions were prompted by juvenile immaturity and that he has since matured into someone who can and should be released.

¶ 40    At the same time, the date of Mr. Vega's crime also ensured that he would not benefit from any opportunities to reduce his sentence by earning day-for-day good time credits. By the time he was sentenced in 2006, Illinois had passed its truth-in-sentencing statute in 1998, which requires that "a prisoner who is serving a term for first degree murder *** shall serve the entire sentence imposed by the court." 730 ILCS 5/3-6-3 (West 2020).

¶ 41    Thus, too old to qualify for a parole hearing, yet too young to qualify for earned good time credits, the only sliver of hope Mr. Vega has for avoiding a *de facto* life sentence is via the narrow door left open by our supreme court in *House*. With this in mind, and fully aware of the fact that the law surrounding his claim is in a state of flux, we consider whether Mr. Vega's *pro se* petition merits further consideration.

¶ 42                                      B. Cause and Prejudice

¶ 43    With the exception of claims for actual innocence, the only way a petitioner can overcome the bar on any consideration of a successive postconviction petition is to establish both (1) cause for failing to raise a claim earlier and (2) prejudice stemming from that failure. *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 34.

¶ 44    To show cause, "a defendant must identify an objective factor that impeded his ability to raise the claim in his initial petition." *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 36. To show prejudice, "a defendant must demonstrate that the claim so infected the trial that the resulting conviction or sentence violated due process." *Id.* If a petitioner satisfies both prongs of this test, then the successive petition may advance and is "docketed directly for second-stage proceedings." *Id.* at ¶ 36 (citing *People v. Sanders*, 2016 IL 118123, ¶¶ 25, 28). "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo.*" *People v. Bailey*, 2017 IL 121450, ¶ 13. We examine each prong of this analysis in turn.

¶ 45                                  1. Cause

¶ 46    Although the State asserts in a heading that Mr. Vega "failed to establish cause *or* prejudice" (emphasis added), we agree with Mr. Vega that, having made no argument in support of the absence of cause in the body of its brief, the State has forfeited this argument. See Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (providing that "[p]oints not argued are forfeited").

¶ 47    Moreover, there is little basis for the State to dispute that the law has changed since Mr. Vega filed his initial postconviction petition in 2008, which establishes cause for his failure to include this claim in that petition. See, *e.g.*, *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 46 (defendant established cause where he could not have raised claims based on *House* and *Harris* before those cases were decided). We share the circuit court's view that Mr. Vega made a *prima facie* showing of cause in his petition. The prejudice prong is more complicated.

¶ 48                                    2. Prejudice

¶ 49     There is currently significant disagreement within the appellate court on what showing is necessary to establish prejudice on a successive *pro se* petition brought by a young adult seeking to establish that the life sentence imposed violates the proportionate penalties clause. As this court noted in a recent case involving an emerging adult petitioner, in the absence of clear guidance from our supreme court as to what exactly constitutes a showing of prejudice in this context, lower courts have struggled to sort these claims, relying on "a myriad of factors." *Horshaw*, 2021 IL App (1st) 182047, ¶ 133. The unsettled status of this question has led to an unfortunate "lack of uniformity," leaving the trial courts "in the unenviable position of having no clear guidance for determining whether or not to grant a defendant's motion for leave to file a successive petition." *Id.* We echo the *Horshaw* court in suggesting that "[a] clear and consistent rule of law is sorely needed to avoid what could possibly be viewed as an *ad hoc* body of case law dependent on the vagaries of a case-by-case approach." *Id.*

¶ 50     Our supreme court has made it clear that "the cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard." *People v. Smith*, 2014 IL 115946, ¶ 35. And thus, "meet[ing] the cause-and-prejudice test *** requires the defendant to 'submit enough in the way of documentation to allow a circuit court to make that determination.' " *Id.*

¶ 51     However, our supreme court has also made it clear that the test should not be deployed in a manner that places too heavy a burden on petitioners to provide conclusory evidence, as that would risk "render[ing] the entire three-stage postconviction process superfluous." *Id.* at ¶ 29. To be granted leave to file, all that the defendant is required to do is make a "*prima facie* showing of cause and prejudice." *Bailey*, 2017 IL 121450, ¶ 24. A petition is to be rejected at this stage only

where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Id.* at ¶ 18; *Smith*, 2014 IL 115946, ¶ 35.

¶ 52 We must therefore be careful not to put the cart before the horse. The question here is not whether Mr. Vega has conclusively proven anything. Rather, all we are considering at this juncture is whether Mr. Vega has alleged sufficient preliminary facts to merit granting him renewed access to the postconviction process. It is not until the second stage where Mr. Vega, with the assistance of appointed counsel, must make a substantial showing of a constitutional violation. *People v. Cotto*, 2016 IL 119006, ¶¶ 27-28; *People v. Edwards,* 197 Ill. 2d 239, 246 (2001).

¶ 53 The court in *Horshaw*, after considering all of this, held that the petitioner should be allowed to file a successive petition based on a *pro se* motion which alleged that he had "adolescent brain deficiencies, significant head trauma's [*sic*], attendant characteristics, family and support, education, peer pressures, maturity and rehabilitative potential together with other mitigating factors." 2021 IL App (1st) 182047, ¶ 145. The *Horshaw* court also relied on a PSI that showed that the petitioner had lost his father at age 12, joined a gang at 13, began smoking marijuana at 15 and was never evaluated or treated for drug usage. *Id.* at ¶ 148.

¶ 54 Similarly, in this case, Mr. Vega has alleged that he was "raised in a single-parent household, his first contact with law enforcement was at age 11" and that "at the age of 13, he was sent to Illinois Youth Center, where he graduated from the eighth grade." He further noted that during his time in juvenile detention, "due to his inability to adjust," he was placed on psychotropic medication and that this medication "was not continued, nor did he receive any follow-up counseling" upon his release. His motion and the attached proposed petition stress that his sentence

failed to consider the hallmark characteristics of his youth "through the lenses of the new developments in science and the law."

¶ 55    Mr. Vega also notes that there is significant precedent supporting his position, citing to numerous cases where this court reversed denials of leave to file successive postconviction petitions for emerging adult defendants with proportionate penalties claims alleging comparable facts. *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 32-40, 52-56; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 13-31; *Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-49; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14; *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 71-73; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 33-34; *Glinsey*, 2021 IL App (1st) 191145, ¶ 55, and *People v. Lenoir*, 2021 IL App (1st) 180269, ¶¶ 56-57.

¶ 56    The State responds by insisting that many of these cases cited by Mr. Vega were wrongly decided. In its view, Mr. Vega is not entitled to relief under the proportionate penalties clause for two primary reasons: "(1) his sentence was discretionary, not mandatory, and (2) his petition offers insufficient factual support for his claim that as an adult offender he was entitled to the same considerations that *Miller* extended to juvenile offenders." We address these considerations in turn.

¶ 57                    i. The Mandatory/Discretionary Distinction

¶ 58    The State contends that the principle underlying *Miller*, and the "analytical underpinning of both *Harris* and *Thompson*," two of the major cases Mr. Vega relies on to establish his claim, is that courts should not be prevented from considering a defendant's youth-based characteristics when issuing a sentence. Thus, because Mr. Vega's sentence was *discretionary*, the State argues, "*Miller*'s principle driving force—individualized attention to the facts and circumstances of the [young] offender—were complied with."

¶ 59    We reject this argument. For one, our supreme court in *Holman*, 2017 IL 120655, ¶ 40, expressly held that *Miller* applies to discretionary sentences in Illinois. While that ruling may have been called into question recently, *Holman* nonetheless remains the law in this state and thus the law we apply in our consideration of Mr. Vega's petition. See *People v. Dorsey*, 2021 IL 123010, ¶ 42 (explaining that in the wake of *Jones v. Mississippi*, 141 S.Ct. 1307 (2021), our supreme court's holding in *Holman*, 2017 IL 120655, ¶ 40 that *Miller* and *Montgomery* apply to both mandatory *and* discretionary life without parole sentences is now "questionable."). Moreover, even if our supreme court overrules *Holman* and limits *Miller* protections only to those defendants who received mandatory life sentences, the sentencing court in Mr. Vega's case had no discretion to give him anything short of a *de facto* life sentence.

¶ 60    In *Buffer*, 2019 IL 122327, our supreme court established a bright line rule: any sentence longer than 40 years is a *de facto* life sentence. As noted above (*supra* ¶ 11), Mr. Vega was subject to a minimum 20-year sentence with a mandatory 25-year enhancement for use of a gun, meaning the minimum sentence he could have been given was 45 years. In other words, Mr. Vega's sentencing judge had no discretion to sentence him to anything less than a *de facto* life sentence under *Buffer*. As we recognized in *Horshaw*, 2021 IL App (1st) 182047, ¶ 130, a life sentence can only be considered discretionary in this context "where the trial court had at its disposal a minimum sentence of less than 40 years yet decided to impose a sentence in excess of that term." That is not what occurred in this case, and we thus reject the State's argument that the discretionary nature of Mr. Vega's sentence disqualifies him from asserting a youth-based proportionate penalties claim.

¶ 61                                    ii. Insufficient Factual Support

¶ 62    The State also argues that Mr. Vega's motion was properly denied because he attached no "pieces of evidence from outside the record in support of his petition." While the State is correct

that Mr. Vega did not attach any affidavits or supportive documentation to bolster the allegations in his (handwritten) petition, this is hardly surprising considering he is a prisoner with no legal training and extremely limited resources. As we explained above (*supra* ¶ 51), our supreme court has implied that the cause-and-prejudice test should not be deployed in a manner that places too heavy a burden on petitioners to provide conclusory evidence. That is why we recently recognized in *Horshaw* that a motion to file a successive petition should be allowed so long as it contains "sufficient specificity to require the matter to be advanced to the second stage, at which time [the Petitioner] will have an opportunity to substantiate his claim further." *Id.* at ¶ 150. As we noted there, the Post-Conviction Act requires that successive petitions be "well pled." *Id.* at ¶ 152 (quoting *People v. Pitsonbarger*, 205 Ill 2d 467, 475 (2002)). And "well pled" does not necessarily demand that a petitioner attach to their initial pleadings conclusive, documentary evidence supporting their allegations.

¶ 63     Mr. Vega has alleged specific, plausible, *provable* facts that he may be able to confirm with the assistance of counsel if his petition were allowed to proceed. For a postconviction court to know whether Mr. Vega's claim is cognizable, he must first be given an opportunity to "fill in the blanks," and document his claim that at the time he committed his offense, he more resembled a juvenile than an adult. *Glinsey*, 2021 IL App (1st) 191145, ¶ 51. That opportunity, however, evaporates the moment he is denied leave to file his successive petition. In *Minniefield*, 2020 IL App (1st) 170541, ¶ 44, we referred to this situation as a "catch-22." Without a developed record, a defendant like Mr. Vega cannot show that his constitutional claim has merit, but, lacking a meritorious claim, "he cannot proceed to develop a record." *Id.*

¶ 64     In addition, as noted above, the law and the science surrounding young adult sentencing is developing in real time. We are clearly in need of further guidance from our supreme court as

to what showing a petitioner like Mr. Vega must make to succeed on an as-applied challenge to his sentence under the proportionate penalties clause. Considering the unsettled nature of this legal question, it is far from "clear" that Mr. Vega's claim fails as a matter of law or is insufficient to justify further proceedings. *Smith*, 2014 IL 115946, ¶ 35. We should not therefore deny Mr. Vega the opportunity to file his petition and move forward to the second stage.

¶ 65                                    IV. CONCLUSION

¶ 66     Mr. Vega has established sufficient cause and prejudice to file his postconviction petition. Accordingly, we reverse the circuit court's denial of his motion for leave to file a successive postconviction petition and remand for further proceedings consistent with the Act.

¶ 67     Reversed and remanded.

¶ 68     PRESIDING JUSTICE PIERCE, dissenting:

¶ 69     The majority has found that petitioner's successive postconviction petition should be granted. I respectfully disagree, as petitioner failed to establish the necessary cause and prejudice for leave to file his successive postconviction petition. In addition, petitioner was 19 years old at the time he shot and killed the victim in this case, and the mitigation evidence in support of his claim that he be treated as a juvenile was known to him at the time of his trial, and he was afforded a *Miller* compliant sentencing hearing.

¶ 70     Under the cause-and-prejudice test, a defendant must show both (1) cause for his or her failure to raise the claim in an earlier proceeding and (2) prejudice stemming from his or her failure to do so. *People v. Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). Recently, in *People v. Dorsey*, 2021 IL 123010, although the court found the defendant's proportionate penalties claim in his successive petition forfeited and barred by *res judicata*, even absent forfeiture and *res judicata*, the court found the defendant failed to establish

- 19 -

the cause necessary for leave to file his successive petition. *Dorsey*, 2021 IL 123010, ¶¶ 70, 74. The court explained:

> "*Miller's* announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause. See *Patterson*, 2014 IL 115102, ¶ 97 ('A ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision.').") As defendant acknowledges, Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller's* unavailability prior to 2012 at best deprived defendant of "some helpful support" for his state constitutional law claim, which is insufficient to establish "cause." See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59, 430 Ill. Dec. 895, 127 N.E.3d 131." *Id.* ¶ 74.

¶ 71    In accordance with *Dorsey*, defendant clearly did not establish a *prima facie* case for cause for failing to previously raise his proportionate penalties argument.

¶ 72    Notwithstanding his failure to establish the necessary cause, petitioner should not be granted leave to file his successive petition because he is an adult seeking *Miller* protection and *Miller* applies to juveniles.  Defendant raised an as-applied, youth-based challenge to his sentence relying on the principles articulated in *Miller* to claim that his sentence is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community. By definition, an "as applied" challenge "is dependent on the particular circumstances and facts of the individual defendant or petitioner." *People v. Thompson*, 2015 IL 118151, ¶ 37.

¶ 73    In this case, petitioner was convicted of shooting and killing Soto in cold blood. There is no hint of any youth related circumstances that could have possibly mitigated his murder. Nothing remotely indicates he acted out of immaturity, poor judgment, youthful indiscretion, mistake,

anger, irrational emotion, mental impairment or any other reason other than cold calculation. He received a discretionary sentence of 75 years' imprisonment; 50 years for the murder with an additional 25-year add-on for personally discharging a firearm. This sentence was imposed after the judge considered every aspect of defendant's background, including his family and criminal history. In my opinion, this discretionary sentence was not "so wholly disproportionate that it shocks the moral sense of the community."

¶ 74     I find petitioner's case analogous to *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 30, and *People v. Handy*, 2019 IL App (1st) 170213, where this court rejected defendant's attempt to extend *Miller* via the proportionate penalties clause to young adults for crimes they personally committed.

¶ 75     In *Carrion*, 2020 IL App (1st) 171001, ¶¶ 3, 4, the 19-year-old defendant entered the apartment of a 69-year-old woman and stabbed her to death. He was convicted of residential burglary and murder and sentenced to 55 years' imprisonment. *Id*. ¶ 16. Defendant sought, and was denied, leave to file a successive postconviction petition on the basis that his 55-year sentence was a *de facto* life sentence that violated the proportionate penalties clause. *Id*. ¶ 21. We affirmed, finding that his "55-year sentence for residential burglary and a senseless murder, which he committed as the principal at the legal age of adulthood, does not shock the moral sense of the community and thus is not cruel or degrading." *Id*. ¶ 30.

¶ 76     Similarly, in *Handy*, 2019 IL App (1st) 170213, ¶¶ 37, 40, the 18½-year-old defendant was sentenced to 60 years' imprisonment for home invasion, armed robbery, aggravated kidnapping, and aggravated criminal sexual assault. *Id*. ¶ 37. We rejected defendant's *Miller* claim, explaining:

> "Whether a defendant physically committed the offense is a significant consideration for
>
> courts tasked with deciding whether to extend *Miller* principles to a young adult under the

proportionate penalties clause. [Citations.] Here, we cannot overlook defendant's active participation where he invaded the victims' house with the codefendants, held a gun to Mr. W.'s head to prevent him from interfering while the codefendants robbed and attacked his family and kidnapped his young daughter, and then actively participated in the gang rape." *Id*. ¶ 40 (citing *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 38 (not extending *Miller* principles where the 18-year-old defendant was the perpetrator of the violent stabbing deaths of three victims); *Thomas*, 2017 IL App (1st) 142557, ¶ 34 (not extending Miller principles where the 18-year-old defendant was the shooter and his convictions were based on his own actions instead of accountability for the acts of another); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (not extending *Miller* principles where the 20-year-old defendant was the one who "pulled the trigger")).

¶ 77    Although recent panels of this court have held that 18 and 19-year-old defendants who received discretionary life sentences (*de facto* or otherwise) for murder were entitled to raise *Miller* claims in postconviction proceedings, those cases are simply not persuasive under the facts of this case.[1] *Carrion* and *Handy*, and the cases cited therein are more persuasive on the issue of

_____

[1] See *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 33, 59 (life without the possibility of parole imposed on the defendant who was 18 years old at the time of the murder and had no prior convictions); *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 6, 33 (natural life in prison without the possibility of parole imposed on a defendant who was 18 at the time of the murder with mental health conditions); *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 6 (discretionary natural life sentence imposed on the defendant who was 19 at time of the murder); *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 17, 18 (discretionary 40-year sentence imposed on the defendant who was

discretionary sentences for young adult defendants who are personally culpable for their crimes, particularly based on defendant's criminal history.

¶ 78    Even accepting petitioner's argument that *Miller* applies to this 19-year-old petitioner, the record show that petitioner is not entitled to further postconviction proceedings for an as-applied challenge to his sentence based on a consideration of his youth and specific circumstances of his life. Relevant "youth and attendant circumstances" include, but are not limited to: "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressure that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46.

¶ 79    Petitioner had a *Miller* complaint sentencing hearing, where the trial court considered the nature of the offense, his PSI which included his social and criminal background, and, importantly, his youth.    The PSI included specific information regarding petitioner's age, childhood, upbringing, seventh grade education, and gang involvement.    As we stated in *Croft*, "a key feature

---

18 at time of the murder); *People v. Carrasuillo*, 2020 IL App (1st) 180534, ¶¶ 1, 11 (indeterminate sentence of 200 to 600 years' imprisonment imposed on the defendant who was 18 years old at the time of the murder with no prior record); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 2, 13 (sentence of 50 years' imprisonment imposed on a defendant who was 19 at the time of the murder with no violent criminal history or gang affiliation).

of the juvenile's sentencing hearing is that the defendant had the 'opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.' " (Emphasis added). *Croft*, 2018 IL App (1st) 150043, ¶ 23 (quoting *Holman*, 2017 IL 120655, ¶ 49). *Croft* noted that the *Holman* factors are "a nonexhaustive list" and that "nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court" because the issue is not the particular sentence the trial court imposed but whether the defendant had the opportunity to present evidence regarding his youth and that the court considered his youth and its attendant characteristics in reaching its sentencing decision. *Croft*, 2018 IL App (1st) 150043, ¶¶ 32-33. See also *People v. Chambers*, 2021 IL App (4th) 190151, ¶ 80 (quoting *Buffer*, 2019 IL 122327, ¶ 27) ("a defendant seeking relief under the *Miller* line of cases 'must show that *** the sentencing court failed to consider youth and its attendant characteristics'–a showing that, one might think, would entail more than observing that the court did not explicitly recite the *Miller* factors.").

¶ 80    In my view, the trial court properly denied petitioner leave to file his successive postconviction petition because he failed to establish cause for failing to file his proportionate penalties claim in his prior petition. Furthermore, even though *Miller* does not apply to petitioner because petitioner was 19 at the time of the offense, the record on appeal in this case is unquestionably sufficient to decide whether his sentencing hearing complied with *Miller*. The record establishes without question that petitioner had the opportunity to present any youth related factors to the sentencing judge and the sentencing court considered his age, social history, educational history, and criminal history in imposing a sentence that was appropriate for the senseless, cold blooded and brutal execution underlying his sentence.

¶ 81    For these reasons, I respectfully dissent.