2022 IL App (1st) 210043
No. 1-21--0043
Opinion filed September 30, 2022

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 00 CR 17515(02) |
| JOHN SEARLES, | ) ) | The Honorable William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mikva specially concurred with opinion.
Justice Mitchell dissented with opinion.

**OPINION**

¶ 1        Defendant John Searles was convicted after a jury trial of the first degree murder and attempted armed robbery of Anthony Leyva. Defendant, who was 20 years old at the time of the offense, was sentenced to consecutive sentences of 60 years for the first degree murder and 15 years for the attempted armed robbery, for a total of 75 years.  This court affirmed his conviction on direct appeal and affirmed the summary dismissal of his initial *pro se* postconviction petition.  In the instant appeal, he appeals the trial court's denial of his motion for leave to file his first successive postconviction petition.

¶ 2        Defendant argues that his *pro se* petition made a *prima facie* showing that his 75-year

sentence, without the possibility of either good-time credit or parole, for an offense he

committed in 2000 when he was 20 years old. violates the Illinois Constitution's proportionate

penalties clause as applied to him, in light of his age, his history of mental health issues, and

his exposure to physical abuse and drug use at an early age.

¶ 3        For the following reasons, we reverse and remand for second-stage proceedings

consistent with this opinion.

¶ 4                                    BACKGROUND

¶ 5        The instant appeal concerns the proportionality of defendant's sentence.  Prior to this

offense, the 20-year old defendant had only one adult conviction, for the relatively minor

offense of defacement to property, and no juvenile record.  In pronouncing a lengthy sentence,

the trial court mentioned in particular, "the nature of the offense" which the court found "to be

particularly aggravating," in that "it was premeditated" and "done pursuant to a plan to rob the

victim" and defendant "armed himself with a particularly gruesome and deadly weapon."

Although the appellate record does not contain a photo of the knife, it was described at trial as

having a curved blade with spikes on the handle and measuring 12 inches in overall length.

The trial court relied heavily on the age of the victim, who was 72 years old, as a particularly

aggravating factor; but it did not discuss defendant's young age or any attributes or

characteristics relating to under 21-year olds.

¶ 6        Since the nature of the offense was the primary reason given for the long sentence, we

describe the evidence at trial in detail below. In short, the evidence established that the 72-year

old victim was married and was also dating Evelyn Rivera who he had met on a phone chat

line.  Rivera's best friend was 19-year old Vanessa Padin, and Rivera's boyfriend was 20-year

old defendant. The three friends talked about scaring Leyva with a knife, so that they could grab a money pouch that Leyva always carried with him. They talked of using the money to throw a "hotel" party for their friends. Rivera was the one who spoke to Leyva on the phone and arranged for his visit to Rivera's home, in the West Lawn neighborhood of Chicago. Rivera also retrieved a knife from her room and handed it to defendant. When the three friends were in Leyva's car, defendant, who was sitting behind the driver, pulled out the knife. The two girls immediately jumped out of the car and ran, leaving defendant as the only witness as to what happened next in the car. Defendant testified that things went awry, when the car suddenly jerked back and the knife that defendant was holding cut Leyva's neck. After the cut to Leyva's neck, the car crashed into a gas station and defendant escaped out of the door where Padin had previously sat. Padin testified that stabbing was not part of their plan.

¶ 7                                     I Trial

¶ 8                                A. Marian Leyva

¶ 9         Marian Leyva, the wife of the victim, testified that they had been married for 40 years. On June 24, 2000, the day of the offense, she went to babysit for her cousins' children, and her husband said he was going to have dinner with some friends but would join her later. While babysitting, she received a call from her daughter that her husband had been taken to the hospital, due to what she initially believed was a car accident. After calling the hospital, she learned from a hospital chaplain that her husband had died.

¶ 10                                B. Peter Karlovics

¶ 11        Peter Karlovics testified that, he was working a shift as an assistant State's attorney (ASA) in the felony review unit, when he received an assignment at 3 a.m. on June 25, 2000, to go to Area One Police Headquarters on the south side of Chicago. There, he met with

3

Detective Halloran, who informed him that three suspects were in custody: Evelyn Rivera, Vanessa Padin, and defendant. Karlovics spoke first with Rivera and then with defendant.

¶ 12 Karlovics testified that he read defendant his Miranda rights at 4:15 a.m. in the presence of Detective Halloran. During the ensuing interview, defendant stated that he had attempted to rob and "car-jack" Leyva with the assistance of Rivera and Padin. During the attempt, defendant stabbed the victim twice and then jumped out of the car and ran away. After making this statement, defendant agreed to record it on videotape. Karlovics next spoke with Padin for an hour. At 6:30 a.m., Karlovics called for the delivery of video equipment and a videographer who arrived more than an hour later. All three suspects had agreed to provide videotaped statements. Karlovics' videotaped interview of defendant began at 8:47 a.m. on June 25, 2000, and the videotape was admitted into evidence and played for the jury.

¶ 13 Neither the transcript nor the tape appears in the appellate record, although both were admitted into evidence and impounded. In the appellate court order denying defendant's direct appeal, this court provided the following brief description of the taped statement:

> "In defendant's videotaped statement of June 25, 2000, he acknowledged that he told assistant State's Attorney Peter Karlovics that he had stabbed Leyva while trying to rob him inside his car. He further said that on the way to the CTA he told Leyva to pull the car over, Leyva cooperated, defendant pulled the knife out and 'held it up and told him to get out.' Leyva refused, put the car in motion, and the two struggled over the knife. Defendant said that he 'was just trying to cut him in the neck and get him to *** let go of the knife and let [him][1] go already.' " (Ellipses and brackets in original.)

---

[1] The brackets around "him" are in the Rule 23 order. It appears as though defendant was saying that he wanted Leyva to let "him" (defendant) go.

4

*People v. Searles*, No. 1-02-2598, slip op. at 5 (Mar. 31, 2004) (unpublished order pursuant to Supreme Court Rule 23).

¶ 14    During cross examination, Karlovics provided the following details from the taped interview. Defendant stated that he used to date Rivera but that Rivera had been dating Leyva for a few months. Rivera and Leyva generally went out once or twice a week. Rivera was supposed to leave for Puerto Rico on June 25. Rivera told defendant that Leyva carried money in a black pouch, and she talked about trying to rob Leyva with a knife that she had. Rivera said that Leyva's car doors might be unlocked. After observing Leyva parked in front of Rivera's house, defendant tried the car doors and discovered the doors were not unlocked. In response, Leyva rolled down his window and defendant told him that Rivera would be right down. Defendant then went back upstairs to Rivera.

¶ 15    Vanessa Padin, age 19 at the time of the offense, testified that she lived with her boyfriend and baby daughter in the basement of the same house where Rivera occupied the second floor. Padin's boyfriend's father lived on the first floor, in between them. Rivera lived with Rivera's mother and sister, and Padin and Rivera had been friends for two years. Padin first met defendant when Rivera "hooked up with him on a date service." On June 24, 2000, Leyva was Rivera's boyfriend, and defendant was an ex-boyfriend of Rivera's. On June 24, at around noon, defendant came to Rivera's home. In addition to Padin and Rivera, Rivera's younger sister and brothers were at Rivera's home. Rivera was planning on going to Puerto Rico on Sunday, June 25, 2000, and Rivera, Padin and defendant were planning on throwing Rivera a party. Defendant had a cousin who was going "to throw a hotel party." However, Rivera, Padin, and defendant had no money for a party. Rivera said that she was seeing a guy who had money and she wanted to rob him. The plan was that, when Leyva came to Rivera's

house, defendant would go into Leyva's car, scare him "with the knife," and run off with the car. Rivera said that Leyva carried money with him in a purse by his side. Rivera provided defendant with a knife that had spikes, and Rivera received a call from Leyva. Defendant went downstairs ten minutes before Leyva arrived. Watching from an upstairs window, Padin saw that, after Leyva pulled up in front of the house in a four-door car, defendant tried to open the passenger door but it did not open. Defendant then walked to the driver's side and came back upstairs. Defendant stated, "that plan didn't work."

¶ 16    Padin testified that they had discussed other plans before defendant tried to open Leyva's door. Rivera had suggested that Padin could go in the car with Rivera, that Rivera could make out with Leyva in the front seat, and that Rivera could throw Leyva's purse in the back seat. However, Rivera stated the make-out plan would not work because Leyva would not kiss Rivera in front of Padin. That is when Rivera said she would just throw the purse out the window. However, defendant thought that was a bad idea. Padin suggested that they could give Padin a ride to "the Orange Line," and "by both of us being in the car with each other, [defendant] could—by me being a female and him being in the car with me, we could both get in the car." Padin believed that Leyva would only drive defendant somewhere if Padin also entered the car.

¶ 17    Padin testified that, after defendant came back upstairs, the three of them went downstairs together and entered Leyva's car, with Rivera sitting in the front passenger seat, Padin sitting behind Rivera, and defendant sitting behind the driver. Rivera asked Leyva to drive Padin and defendant to the Orange Line which he agreed to do. After a couple of blocks, defendant told Leyva to stop at a stop sign, and Leyva said, " 'I thought you wanted me to drop you off at the Orange Line." But Leyva stopped the car, and defendant pulled out the knife

and said: "Give me your money or I'm gone to kill you." Defendant held the knife near Leyva's neck while Leyva kept saying no. Padin tried to open the back door but could not because it had a child safety lock. Rivera exited the front seat, opened the back door for Padin, and the two of them ran from the car. When Padin last saw defendant in the car, defendant's arm was no longer near Leyva's neck but down near his midsection. As they ran, Padin looked back and observed the car pulling away.

¶ 18 Padin testified that the two girls ran initially but then walked back to their house. As Rivera and Padin were heading to the back stairs, Rivera mentioned that she had observed defendant in the garage. When Rivera mentioned seeing defendant, Padin said that they should go in the front of the house instead. As Rivera and Padin walked down the gangway toward the front of the house, defendant followed behind them and into the house. In the house, defendant stated "that he stabbed him six times in his side, and he stabbed him in his neck so he wouldn't talk." Rivera kept asking defendant about the money but defendant did not say anything about it. Defendant said that the car had crashed into a gas station, so Rivera and Padin walked toward the gas station to see if defendant was lying about the stabbing. Rivera left Padin at a taco shop a couple of doors down from the gas station, and Rivera continued walking toward the gas station. Padin waited ten minutes and then went back to the house. When Padin returned to the house, defendant was wearing different clothes. Defendant said that he took off his hoodie because it had blood on it. Rivera returned to the house later that evening with police. Padin answered the door and a policeman asked for Rivera's mom who Padin went to get. Rivera's mother came down to talk to the police, and the police then went up to Rivera's apartment. Padin was in Rivera's apartment, as was defendant, when the police entered it.

¶ 19        Padin testified that, after the police left with defendant, she spoke with Detective John Halloran and showed him where Rivera kept the knives and where Rivera and defendant's wet clothing was. Padin later went to the police station where she gave a videotaped statement and she was charged with first degree murder and attempt armed robbery. Padin's attorney and the State reached a plea agreement whereby, in exchange for her testimony, the State would dismiss the murder charge against her, but proceed with the attempt armed robbery charge, which had a possible sentence of 4 to 15 years. Padin understood that the State was going to recommend a 14-year sentence that was eligible for 50% good-time credit, such that it was possible for her to serve only 7 years in jail. Padin identified the knife and its sheath and testified that, when defendant received the knife, it was in the sheath.

¶ 20        On cross examination, Padin testified that Rivera met Leyva on a "party line service," which Padin described as a 900 number where people could call and chat. Padin and Rivera did not do any drugs while waiting for Leyva and she did not think defendant did either. Padin testified that Rivera collected knives. Padin said it surprised her when defendant pulled out the knife; Padin was scared and wanted out of the car. However, she could not open the door because it seemed as though a child safety lock was on. Rivera had to exit the front passenger-side door and open Padin's door from the outside. Padin did not remember telling Detective Halloran that defendant kept telling Leyva to stop the car. On redirect, Padin testified that she became scared when defendant pulled out the knife because she had not thought defendant was "going to do it." Stabbing was not part of the plan.

¶ 21        Peter Larcher, a Chicago police officer, testified that he was an evidence technician who helped process the crime scene and he identified photos showing where the knife was

recovered in the car; where a gym shoe was recovered near the car, and where a sheath for the knife was found in a nearby alley.

¶ 22 Sergeant James Bland testified that, in the evening of June 24, 2000, he was working as a patrolman on the southwest side of Chicago with his partner Officer Margaret Burke. They were in uniform and in a marked police car. It was "pouring rain" when they received a call to assist at a nearby vehicle crash. When they arrived, paramedics were trying to remove the driver from the vehicle. After Bland exited his car and walked over, he observed the victim on a stretcher and the paramedics loading him into an ambulance. The victim was bleeding profusely and was unresponsive. After Bland had been on the scene for ten or fifteen minutes, Evelyn Rivera arrived and tried to get past the yellow accident-scene tape. When Bland stopped her, she stated "that's my boyfriend's car."

¶ 23 Bland testified that he "put" Rivera in the back seat of his police car in order to "get her out of the rain." Bland and his partner, Burke, spoke to Rivera, and she provided them with the description of a suspect. Bland and Burke were driving Rivera to the police station, but they stopped first at Rivera's house so they could inform her mother where she was going. After arriving at Rivera's house, Bland exited the car leaving his partner with Rivera in the car. Another police car pulled up and an officer[2] from the other car accompanied Bland as he walked toward Rivera's home. They knocked on a door on the first floor and were informed that Rivera lived upstairs. After they headed upstairs, Vanessa Padin opened the door. When Bland asked for Rivera's mother, Padin invited them inside. Bland entered and was walking down a hallway with doors off of it, when Bland observed defendant standing "right inside"

---

[2] On cross, Bland testified that this officer's last name was Rybolt.

the first doorway. Bland reached out and grabbed him because he matched the physical description provided by Rivera. Bland noticed that defendant was shoeless.

¶ 24 Bland testified that he asked defendant who he was, and he replied that he was a friend of Rivera's. When Bland asked about defendant's shoes, he said they were in another room. After placing defendant in handcuffs, Bland called for back-up. Rivera's mother agreed to a search of the house during which Bland found two piles of "sopping wet" clothes. One pile matched Rivera's description of the offender's clothing, and the other pile contained Rivera's clothes.

¶ 25 On cross examination, Bland testified that, after arriving at the scene, he looked inside the victim's car and observed a black bag and a knife inside the car. The knife was "on the console," when he first saw it. Bland testified that the two piles of wet clothes were in a bedroom off the kitchen, on the floor. A staircase led from that bedroom to the outside.

¶ 26 Detective John Halloran testified that, on June 24, 2000, at 8:30 p.m. he and his partner, Detective Frank Valadez arrived at the crime scene with Detective John Murray. It was raining heavily. Inside the victim's car, he observed smears and pools of blood and "a large curved bladed knife," which measured 12 inches in overall length, including a five-inch long blade. The knife rested in a pool of blood "on the center console." Near the car, he observed a gym shoe. While Halloran was at the scene, Rivera approached and he spoke with her while she was seated in the backseat of Bland's police car. Before leaving the scene at 10 p.m., he directed Bland to transport Rivera to Halloran's office. After departing the scene, Halloran went to the hospital to observe the body and he noted a large gaping stab wound to the victim's neck, approximately six puncture wounds by the victim's right shoulder, and lacerations on the right side of the victim's stomach and on his hand.

¶ 27    Halloran testified that, before leaving the hospital, he was notified of activity at Rivera's house and so he drove there. Rivera's house was five to six blocks from the offense scene. When Halloran arrived at Rivera's house, he observed Rivera seated in one police car and defendant seated in another, and Padin "moving about in and out" of Rivera's house. Defendant did not have shoes on. The police located a sheath cover for the knife in an alley near the offense scene. After searching, the officers and the three suspects went to the police station, where Halloran spoke to all three suspects. After the interviews, Halloran called ASA Karlovics who came to the station, arriving at 3 a.m. on June 25. Karlovics also interviewed the three suspects and then called for a videographer who arrived at 8 a.m. on June 25. Videotaped statements were recorded from all three suspects and all three suspects were charged. While at Rivera's house, Halloran did not observe any evidence of narcotics or drugs in the house. From Leyva's car, Halloran removed a black pouch containing a wallet with identification belonging to Leyva and $420 in cash in a rubber band. On cross examination[3], Halloran testified that Padin told him that defendant ordered Leyva to stop the car.

¶ 28    The State introduced and the court admitted a certified copy of the victim's birth certificate, showing that the victim was 72 years old. The State then called Dr. James Filkins, who had been an assistant medical examiner back in June 2000, with the Cook County Medical Examiner's Office. Filkins had performed the autopsy on the victim. The court found, without objection, that Dr. Filkins was qualified to testify as an expert in forensic pathology. Dr. Filkins testified that the victim had a number of injuries on his body, including: a "slicing or incised wound" on the right side of the neck that severed the carotid artery and the jugular vein, a scraping cluster of abrasions on his right shoulder, a puncture wound on his right shoulder, a

---

[3] A page of Halloran's cross examination is missing from the appellate record.

scraping abrasion on the right side of his back, a puncture wound on the right side of his back, an abrasion near his belly, and two abrasions on the front of his right thigh. The victim also had a number of injuries on his hands, including: a slicing wound on his right index finger, a slicing wound on the back of his right hand, and two puncture wounds on the left ring finger. The injuries on the victim's hands were consistent with being defensive wounds. The victim's injuries were consistent with being caused by the knife in evidence. The incised or slicing injuries would have been caused by the blade portion of the knife, while the puncture wounds would have been produced by the "pointed barbs on the handle portion of the knife." The lacerations could have been caused by either the blade or the barbs. The doctor would expect to see a lot of bleeding from the cuts to the carotid artery and the jugular vein, since the carotid artery is the main artery carrying blood from the heart to the brain and the jugular vein is the main vein carrying blood back from the brain to the heart. The doctor performed toxicology tests for alcohol, cocaine and opiates and each of the test results was negative. On cross, he testified that, while one wound was more serious than the others, the multiple wounds all contributed to the victim's death.

¶ 29    After the State rested and the court denied defendant's motion for a directed verdict, the defense called defendant as a witness on his own behalf. Prior to his testimony, the trial court informed the jury that "due to an injury *** [defendant] has his jaw *** wired shut and so he may have some difficulty speaking to you but I'm sure he's going to do the best he can." The trial court instructed: "Let me know if there is anything you don't understand[;] just raise your hand."

¶ 30　　　　Defendant testified that he was 22 years old at the time of the trial. Prior to the offense, he had lived with his mother and worked in a Chicago public school as a janitor.[4] Defendant met Rivera through defendant's brother and had known her for four months. During this time, defendant and Rivera became engaged to be married. Defendant later found out that Rivera had another boyfriend, namely, Leyva. Two months before the offense, Rivera told defendant about Leyva. However, defendant had not met or seen Leyva prior to the day of the offense.

¶ 31　　　　Defendant testified that, on June 24, 2000, defendant woke up at Rivera's house at 9 a.m. and they were "getting the kids together" and Rivera's mother had already left for work. During the morning, defendant and Rivera were planning a party and smoking "P.C.P." At "about noontime," Padin was at Rivera's house and Padin started smoking P.C.P. at about 2 p.m. Leyva called and Rivera spoke to him. After the phone call, Rivera said that they should rob him "to get some money together to have" a party because Leyva had between $200 and $500 in traveler's checks on him. Padin and Rivera discussed Rivera fooling around with Leyva in his car, so that Rivera could toss Leyva's wallet out the window. Then Padin came up with the idea that Rivera could toss "the pouch" in the back seat. Leyva called twice more, and defendant said that they "should just rob him."

¶ 32　　　　Defendant testified that Rivera called Leyva at 6:30 p.m. to come pick her up. Rivera went into her room, got the knife in question, gave it to defendant and stated that Leyva would be there at 8 p.m. When Leyva called to say he was close by, defendant went downstairs and out the front of the house. Rivera had mentioned that Leyva's car doors were always unlocked, so defendant tried to open a door but found it locked. Defendant walked around to the driver's

---

[4] Later, on cross examination, defendant testified that, on the day of the offense, he was living with Rivera, not his mother, and that he had not worked in months.

side and Leyva rolled down his window, and defendant told him that "it would be just a minute." Defendant then went back upstairs to Rivera's home and told Rivera that we "can't rob him he knows what is going on." Rivera got mad and said that they would just drop defendant off at the train station. After Rivera, defendant, and Padin went outside, Rivera told Leyva to drop defendant and Padin at the train station. At that point, defendant's intent was to go to the train station and he "wanted to get away from the whole scene."

¶ 33       Defendant testified that, after Rivera, defendant, and Padin entered Leyva's car, Leyva drove a couple of blocks and defendant pulled out the knife. Defendant testified that he pulled out the knife because he "wanted it out of the car." Defendant told Leyva several times to stop the car. Instead, Leyva grabbed the knife. Defendant "just wanted out of the car." Defendant was becoming angry because Rivera was sitting in the front seat with Leyva, holding hands. When defendant pulled out the knife, the knife was between the seats. When Leyva grabbed the knife, defendant told him: "no, give me the knife and let me out of the car." Defendant did not ask Leyva for money and did not have the knife around Leyva's neck. When Leyva stopped the car, both girls jumped out and defendant tried to take back the knife so he could jump out too, but Leyva "took off, hit the gas."

¶ 34       Defendant testified that he was trying to reach over the seat, "the console for the gears to try put it in park," so he could exit. During this time, defendant and Leyva were struggling back and forth over the knife. Defendant finally reached the gears with his left hand and Leyva accelerated. Defendant thought the car was parked but it "jerked" and then kept going. When the car jerked, defendant "came back with the knife and it cut [Leyva] in the neck." When the car jerked, it went into neutral, and defendant went backwards and cut Leyva. Then the car went "back up to 30" miles per hour. Defendant thought that, prior to the neck cut, defendant

14

may have cut Leyva "on the side because [Leyva] pulled the knife down and [defendant] pulled it back up."  After the neck cut, the wheel turned and the car crashed into a gas station. Defendant was able to open the door that Padin had exited from and he jumped out of the car. Defendant never demanded money from Leyva and did not intend to rob or hurt him.

¶ 35        Defendant identified photos taken at the police station showing injuries to defendant's right and left hands, as a result of the altercation. After exiting Leyva's car, defendant went to Rivera's house. When Rivera returned, defendant went upstairs and changed his clothes. Eventually defendant went to the police station and gave a couple of statements regarding the incident.

¶ 36        On cross examination, defendant testified that he had dated Rivera for four months and had been engaged for three weeks, prior to the offense.  Defendant was not happy that Rivera was also dating Leyva, who she had been dating for three months.  When defendant saw Leyva for the first time, which was the night of the offense, defendant was surprised how old he was. At that time, defendant had not worked for two months.  Defendant was not living with his mother but with Rivera; he slept at Rivera's house every night.  Leyva took Rivera out to dinner and to restaurants, but she never said they had sex.  Rivera mentioned more than once that Leyva carried a wad of bills with hundreds of dollars in a bag which he always had with him in his car.  The night of the offense, a party had been planned for Rivera but it had to be cancelled. They had planned to do drugs and drink at the party, with defendant expected to buy drugs and alcohol for it.  Rivera wanted a party because she was leaving the next day for Puerto Rico. Since Rivera wanted a party, defendant wanted to help throw it, and so he needed money for it.  The three of them talked about robbing Leyva.  Defendant testified:  "I said I would rob him."  While it was Rivera and Padin's idea to rob Leyva, it was defendant's idea to try to

"carjack" him. When he received the knife, which he identified by exhibit number, it was sheathed in a leather case, and defendant hid it in his pants.

¶ 37     Defendant testified that, after he went outside, spoke to Leyva and returned to Rivera's home, defendant just wanted a ride to "the el" to go to a friend's house. At that point, the intended carjacking had not worked. Defendant called a friend using Rivera's phone and said he was coming over. Defendant was upset and had no intent of going to a party. When the three entered Leyva's car, Rivera asked Leyva to drive both Padin and defendant to the el. Defendant assumed that Padin, who lived in the same building as Rivera, was also going to defendant's friend's house. In Leyva's car, defendant sat in the back seat, behind the driver. When defendant told Leyva to stop the car, defendant already had the knife out, between the headrests of the front seats. In order to pull out the knife, defendant had to pull it out from inside his pants and pull it out from its leather sheath. The sheath had a buckle which defendant had to unbuckle. When Leyva stopped the car and the two girls exited, defendant stayed in the car, in order to get the knife back from Leyva. Leyva had grabbed for the knife with his right hand, and Leyva's hand was mostly over defendant's right hand, which was on the knife handle. After the car crashed, defendant left the knife in the car and ran, leaving a shoe behind. As he was running to Rivera's house, defendant threw away both the other shoe and his hooded sweatshirt. At Rivera's house, defendant changed clothes, as did Rivera and Padin, since the clothes were soaking wet. Rivera asked defendant about the money, but he did not want to talk about it. Rivera left and defendant watched a movie for a few minutes. At some point, the police arrived and transported defendant to the police station, where defendant told Detective Halloran that this was a terrible accident. Detective Halloran told defendant that "everybody was cooperating and [defendant] tried robbing" Leyva. At one point, defendant had told

16

Detective Halloran that another man, who was defendant's cousin, had entered Leyva's car and stabbed him, but that was not true. At the end of his testimony, defendant admitted that he killed Leyva, but asserted that he was only aware of stabbing him once.

¶ 38        After defendant's testimony, the defense rested. During jury instructions, the jury was instructed on, among other things, felony murder, or that it could find defendant guilty of first degree murder if, in performing the acts which caused death, he was attempting to commit the offense of armed robbery. After listening to closing arguments and jury instructions, the jury retired to deliberate at 7:06 p.m. and returned at 8:58 p.m. with a verdict finding defendant guilty of first degree murder and attempt armed robbery.

¶ 39                                    II. Sentencing

¶ 40        On August 5, 2022, the trial court denied defendant's posttrial motion for a new trial and proceeded to sentencing. The sentencing range for first degree murder was 20 to 60 years (730 ILCS 5/5-8-1(a)(1)(a) (West 2000)), and the sentencing range for attempted armed robbery was 4 to 15 years (720 ILCS 5/8-4(c)(2), 18-2(b) (West 2000), 730 ILCS 5/5-8-1(a)(4) (West 2000)). In addition, the trial court had the authority to impose an extended-term sentence (730 IlCS 5/5-8-2 (West 2000)) for the murder, since the victim was over 60 years old (730 ILCS 5/5-5-3.2(b)(4)(ii) (West 2000)). The minimum extended term sentence for first degree murder was 60 years, with a maximum of 100 years. As explained below, the trial court declined to impose an extended term sentence and chose, instead, to consider the victim's age as an aggravating factor within the original 20-to-60-year sentencing range for murder.

¶ 41        In aggravation, the State asked the trial court to consider the victim impact statements from the victim's wife and daughter and noted that defendant had agreed to stipulate to a pending matter. In an unrelated matter, defendant had been charged with possession of

17

marijuana in a penal institution. The State agreed that defendant's prior criminal history was "not extensive." Defendant had only one prior adult conviction for criminal defacement to property, and a computer search revealed no juvenile records.

¶ 42	In the presentence investigation report, defendant reported that his father was abusive and, as a result, defendant slept at night with a knife. His father had a heroin addiction and physically abused his mother for several years prior to their separation. Defendant reported that he had been hospitalized for a month at age twelve and again for a month at age 14 in a mental hospital. With respect to the second hospitalization, defendant reported that his mother thought he was suicidal because he had lost his best friend. Defendant reported that he started smoking marijuana when he was eleven and that he had used cocaine, acid, PCP and ecstasy. Prior to his incarceration, defendant used PCP every few days and was under its influence when arrested. He had never received drug treatment. Defendant described his physical condition as "fair," reporting that he suffered from asthma since birth and used an asthma pump on a daily basis. In mitigation, defendant submitted letters from his grandmother, mother, sister and brother, and noted that he had received his GED while in Cook County Jail. Defendant also expressed remorse for the victim and his family.

¶ 43	The letters that defendant submitted from his family are not in the appellate record. Other than to state that he had read the letters, the trial court did not describe the letters, so the record does not reveal their length, level of detail, or what they said. Unlike the letters in mitigation, the victim impact statements from Leyva's wife and daughter are present in the record.

¶ 44	Pronouncing sentence, the trial court found:

"I am acutely aware of the nature of the offense as I presided over this trial. And I have taken into consideration the history and character of defendant.

It is clear and has been proven actually by the jury's determination that the victim in this case was over the age of 60. In fact, he was significantly older than that. I find that obviously to be aggravating. It's an aggravating factor under the statutory aggravating factors. In addition, it is a fact that can be used to impose an extended term sentence with regard to [defendant].

The nature of the offense I also find to be particularly aggravating. I find that it was premeditated. That it was done pursuant to a plan to rob [the victim]. [Defendant armed himself with a particularly gruesome and deadly weapon. ***

On the other hand, I have taken into consideration the matters that were brought to my attention in the letters that I have received from [defendant's] family and what is included in the pre-sentence investigation. I also take into account the fact that [defendant] does not have any significant prior criminal history.

As the result of that, the court has concluded that although it will be within my authority at this time to impose an extended term sentence with regard to the offense of first degree murder, I am going to decline to do so.

I will utilize in my considerations, however, the age of the victim as an aggravating factor within the original range of sentencing for the offense of first degree murder I am going to sentence [defendant] to the maximum that I can sentence him for in the original range for first degree murder.

[Defendant] will be sentenced to 60 years ***."

¶ 45    The court noted that defendant "will serve 100 percent" of the 60-year sentence, and the court imposed an additional 15-year consecutive sentence for the attempt armed robbery. Defense counsel immediately tendered a motion to reconsider sentence which alleged that defendant's sentence was excessive and disparate when compared to the sentences of his co-defendants Rivera and Padin who received 38 years and 14 years, respectively. The trial court denied the motion and the State moved to nolle pros the marijuana possession charge, which the court granted.

¶ 46                                III. Direct Appeal

¶ 47    On direct appeal, defendant argued that the trial court erred by refusing to instruct the jury regarding involuntary manslaughter and by not instructing the jury *sua sponte* on the lesser included offense of conspiracy to commit attempted armed robbery.

Additionally, defendant claimed that his sentences were excessive and that the trial court failed to take into account his age, his lack of criminal background and his completion of his G.E.D. in jail. In an order issued on March 31, 2004, the appellate court did not find these claims persuasive. *People v. Searles*, No. 1-02-2598, at 8-9 (Mar. 31, 2004) (unpublished order issued pursuant to Rule 23). Finding no abuse of discretion, the appellate court found:

> "Prior to sentencing, the trial court considered the letters submitted by defendant's family, acknowledged that he did not have any significant prior criminal history, and reviewed the presentence investigation report which mentioned that he had obtained a G.E.D. Defendant was also allowed to address the court. During his allocution, he stated that he was sorry and he felt remorse for the victim and his family. However, the trial court determined that defendant's sentences were appropriate after noting that the victim was significantly over the age of 60, that the crime was premeditated and

done pursuant to a plan to rob the victim, and that defendant armed himself with a particularly gruesome weapon. Given the considerable discretion accorded to the trial court in determining the appropriate sentence, and recognizing that defendant was eligible for a maximum term of 100 years on the murder count, we find no abuse of discretion." *Searles*, No. 1-02-2598, at 11.

In support, the appellate court cited *People v. Peacock*, 324 Ill. App. 3d 749 (2001), in which the court found no abuse of discretion in sentencing a 17-year old with no criminal background to 110 years for the murder and car-jacking of a 60-year old victim. *Searles*, No. 1-02-2598, at 11.

¶ 48                                    IV. Initial Postconviction Petition

¶ 49          In defendant's initial *pro se* postconviction petition, filed on March 9, 2005, defendant raised a number of claims, including that his trial counsel was ineffective for failing to raise the issue of defendant's mental health and that the trial court erred when it forced defendant to go to trial even though defendant had a broken jaw. The trial judge, who was the same trial judge who had presided over defendant's original trial, dismissed the petition as frivolous and patently without merit on March 18, 2005.

¶ 50          On August 15, 2006, the appellate court affirmed the dismissal. *People v. Searles*, No. 1-05-2203 (Aug. 15, 2006) (unpublished order pursuant to Rule 23). In the order affirming the dismissal, the court noted that defendant claimed that he had informed his trial counsel that he had been placed on a number of different medications due to mental disorders, but his counsel told him not to worry about it and avoid the medication if possible. Defendant claimed that his trial counsel was ineffective for failing to raise the issue of defendant's competence to stand trial and to move for a competency hearing and that his appellate counsel was ineffective for

failing to raise on direct appeal his fitness to stand trial. Defendant's petition claimed that his allegations were supported by evidence of his " 'long history of mental illness as evinced by his frequent hospitalizations beginning in childhood.' " *Searles*, No. 1-05-2203, at 2-3.

¶ 51 The appellate court found that defendant's psychological problems as detailed in the presentence report "related solely to his childhood problems," and that there was no indication that these problems had continued into adulthood. *Searles*, No. 1-05-2203, at 6. Although defendant claimed that he was on different medications due to different mental disorders, the appellate court found that he did not provide "specificity" or evidence that it affected his ability to understand the proceedings against him or participate in his defense. *Searles*, No. 1-05-2203, at 6. As a result, the court did not find this claim persuasive.

¶ 52 V. The Instant Petition

¶ 53 On October 23, 2019, defendant filed *pro se*: (1) a motion for appointment of counsel; (2) a petition for leave to file a successive postconviction petition; (3) a postconviction petition; and (4) a supporting memo. Defendant alleged that, although he was 20 years old at the time of the offense, he had the mental capacity of an adolescent, in light of his documented history of mental illness and drug abuse. Defendant alleged that the trial court imposed sentence without any consideration of his age, impetuosity, level of maturity, susceptibility to peer pressure or potential for rehabilitation. Defendant alleged that, without any eligibility for parole or good-time credit, his earliest possible release date was at age 87, if he lived that long. Defendant claimed that his sentence, in light of the truth-in-sentencing laws requiring him to serve his entire sentence, violated both the proportionality clause of the Illinois Constitution and the eighth amendment of the United States Constitution, as applied to him.

¶ 54    In support, he cited precedent and statute decided or enacted only a few months earlier, including: (1) *People v. Othman*, 2019 IL App (1st) 150823, ¶ 90,[5] where this court found that the Truth in Sentencing Act (735 ILCS 5/3-6-3(a)(2)(i) (West 2006)) was unconstitutional as applied to juvenile defendants; (2) *People v. Buffer*, 2019 IL 122327, ¶ 41, where the Illinois Supreme Court found that a prison sentence of more than 40 years imposed on a juvenile constituted a *de facto* life sentence; and (3) an under-21 parole statute which provided, in relevant part, that "[a] person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review by the Prison Review Board after serving 20 years or more of his or her sentence or sentences, except for those subject to a term of natural life imprisonment." 730 ILCS 5/5-4.5-115(b) (West 2020).

¶ 55    Defendant sought "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" and a "hearing in accordance with new case/and state laws."

¶ 56    The first hearing on his petition, for which we have a transcript, occurred on February 21, 2020. An ASA appeared on behalf of the State, and the transcript notes that "[n]one appeared on behalf of the Defendant." The trial judge stated that he had no idea why the matter was here and asked the State if it knew, and the ASA offered to order the "State file." On April 3, 2020, an ASA was again present when the matter was continued. On October 30, 2020, over a year after defendant's motion was filed, the trial court indicated in a Zoom proceeding,

---

[5] The appellate court issued a new opinion after a remand and supervisory order from the Illinois Supreme Court. *People v. Othman*, 2020 IL App (1st) 150823-B.

with an ASA present, that it was denying defendant's motion for leave, for reasons indicated in a written order.

¶ 57    In its written order, dated October 30, 2020, the trial court observed:

"[Defendant] merely reports his age, his lack of a prior criminal background, and that he 'suffered through parental neglect and physical abuse as a child' and 'grew up in a crime and gang infested neighborhood.' [Defendant] makes a conclusory statement that he 'had the mental and maturity level of a child.' "

The trial court found defendant's sentencing claims unpersuasive.

¶ 58    On March 18, 2021, this court granted defendant's motion for leave to file a late notice of appeal from the trial court's October 30, 2020, order and appointed the State Appellate Defender to represent defendant.

¶ 59                                    ANALYSIS

¶ 60    In the case at bar, defendant seeks leave to file a successive petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The Act provides a statutory remedy for criminal defendants who claim that their constitutional rights were violated at trial or at sentencing. *People v. House*, 2021 IL 125124, ¶ 15 (the Act permits inquiry into constitutional issues relating to conviction or sentence). Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed." *People v. Edwards*, 2012 IL 111711, ¶ 22. To file a successive petition, a defendant must establish either (1) cause for not filing earlier and prejudice or (2) actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. In the instant case, defendant alleges only cause and prejudice.

¶ 61          Prior to commencing a successive proceeding, a defendant must obtain leave of court to file his or her petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. At this threshold stage, when a defendant seeks leave to file, he or she is required to demonstrate only "a *prima facie* showing of cause and prejudice." *People v. Bailey*, 2017 IL 121450, ¶ 24. If leave to file is granted, the petition will be docketed for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 28. Thus, at this early leave-to-file stage, the petition does not have to make the "substantial showing" that will later be required at a second-stage hearing after counsel is appointed. *Robinson*, 2020 IL 123849, ¶ 58. "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim ***." *Sanders*, 2016 IL 118123, ¶ 24.

¶ 62          We find it troubling that the State was present at hearings at which the trial court considered and ultimately denied defendant's motion for leave to file, and that, when the trial court expressed confusion about what the case was about, the State offered to provide its own file—and may have in fact provided it, for all we know. Our supreme court has found it "improper for the State to provide input to the court before the court has granted a defendant's motion for leave to file a successive petition." *People v. Bailey,* 2017 IL 121450, ¶ 20. The motion for leave to file is directed to the court alone, and it is the court alone who should decide the preliminary legal question of whether the defendant made the required cause-and-prejudice showing. *Bailey,* 2017 IL 121450, ¶ 25. Although input or participation by the State, if any, prior to the trial court's denial was improper, "the relief" remains the same whether or not this error occurred. *Bailey,* 2017 IL 121450, ¶ 41. As a court of review, and "[i]n the interest of

judicial economy," we review the motion "ourselves" to determine whether there is "need for remand." *Bailey,* 2017 IL 121450, ¶ 42.

¶ 63 It is also troubling that key parts of the record, such as defendant's videotaped statement, are missing, leaving both this court and the trial court to rely on a one-paragraph summary in an unpublished order that contains confusing ellipses and brackets. The letters from defendant's family, which were submitted by him in mitigation at sentencing, are also not in the appellate record. As a result, almost the entire case that defendant made for mitigation at sentencing is simply not before us. One advantage of a remand for second-stage proceedings is the appointment of an attorney in the trial court who can, hopefully, provide a more complete record before the next step in the process. [6]

¶ 64 To determine whether a defendant has made a *prima facie* showing, we apply a *de novo* standard of review. *Bailey*, 2017 IL 121450, ¶ 13. *De novo* consideration means that a reviewing court performs the same analysis that a trial judge would perform in reviewing defendant's motion for leave to file his petition. *People v. Meneses*, 2022 IL App (1st) 191247-B, ¶ 16.

¶ 65 Under the cause-and-prejudice test, a defendant must show both (1) cause for his or her failure to raise the claim in an earlier proceeding and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). In the case at bar, we find defendant has established both.

---

[6] There was no index to most of the appellate record, which was also out of chronological order. Illinois Supreme Court Rule 342 requires the appellant to provide an index to the record that states the nature of each document and "the names of all witnesses and the pages on which their direct examination, cross examination, and redirect examination begins." Ill. S. Ct. R. 342 (eff. Oct. 1, 2019). "Illinois Supreme Court Rules *** are mandatory, not optional." *Denton v. Univeral Am-Can, Ltd.*, 2019 IL App (1st) 181525, ¶ 23.

¶ 66         First, as to cause, defendant could not have argued that his sentence was disproportionate, in light of the new parole law for under-21-year-olds, prior to its passage into law in 2019. The law provides that "[a] person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences." 730 ILCS 5/5-4.5-115(b) (West 2020). Even if he had been sentenced on or after the effective date, defendant would not have been eligible for earlier consideration under the new law, since he had not served 20 years or more of his sentence until sometime in 2020. Thus, defendant has made a *prima facie* showing as to cause.

¶ 67         Second, as to prejudice, the sentencing transcript establishes that, while the sentencing court focused on the age of the victim, it did not consider any characteristics or attributes of under-21-year-olds, such as their lack of maturity or susceptibility to peer pressure. The trial transcript itself provides evidence of peer pressure and juvenile thinking. The three youthful offenders wanted to scare an adult into giving them money so they could throw a party. As Padin, the government witness, testified, a stabbing was never part of their plan. Without the prodding and pressure by the "girlfriend," the plan would not have been hatched. It was her knife; she gave it to him; she wanted the party; and she arranged the visit and ride by Leyva. When Rivera initially jumped out of the car, both defendant and Padin were trapped in the back seat as the result of child safety locks, but Rivera opened the door for only Padin. Defendant had no juvenile record and one adult conviction for the relatively minor offense of defacing property. His case for mitigation was supported by a number of letters, which neither the court below that ruled on his motion nor this court has had the opportunity to read.

¶ 68　　　　　The sentencing transcript establishes that the sentencing court did not consider defendant's potential for rehabilitation. The proportionate penalties clause of our constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. This constitutional provision requires the balancing of the twin goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Like the eighth amendment, the proportionate penalties clause of the Illinois constitution embodies our evolving standard of decency. *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionate penalties clause and the eighth amendment). *People v. Savage*, 2020 IL App (1st) 173135, ¶ 64; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35.

¶ 69　　　　　However, "[t]he purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *Minniefield*, 2020 IL App (1st) 170541, ¶ 35. Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against both oppressive penalties and disproportionality in the law. *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; *Savage*, 2020 IL App (1st) 173135, ¶ 65; see also *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). Under the broader protection provided by our state's own clause, defendant has made a *prima facie* showing that, as applied to him, denying him some meaningful opportunity

to demonstrate his potential for rehabilitation, while granting that same opportunity to other similarly situated under-21-year-olds who committed the same exact offense at a later date, may run afoul of our proportionate penalties clause.

¶ 70       In addition, and as further support for our reversal and remand at this early stage, we note both (1) the troubling aspects of these proceedings that we discussed above in paragraphs 62 and 63, and (2) the fact that defendant's petition makes a *prima facie* showing for an as-applied challenge under *People v. Harris*, 2018 IL 121932.   As defendant argues, in *Harris*, the Illinois Supreme court opened the door for an offender aged 18 and older to seek *Miller*-type protections under our state's proportionate penalties clause, as applied specifically to him. *Harris*, 2018 IL 121932, ¶¶ 45-48. *Harris* permits a defendant to argue that "the evolving science on juvenile maturity and brain development" (*Harris*, 2018 IL 121932, ¶ 46) as applied to "his particular circumstances" (*Harris*, 2018 IL 121932, ¶ 45) and "the specific facts" of his case (*Harris*, 2018 IL 121932, ¶ 45) may state a claim under the proportionate penalties clause of our own state constitution. In this case. defendant's initial postconviction petition was filed in 2005, which is about seven years prior to *Miller* and 13 years prior to *Harris*, thereby establishing cause.  As for prejudice, defendant' *pro se* pleading alleged that he had "the mental and maturity level of a child, who suffered from [*sic*] through parental neglect and physical abuse as a child."  Thus, we find that defendant's *Harris* claim and the troubling aspects of the claim noted above (*supra* ¶¶ 62-63) further support our decision that a dismissal at this early stage was premature.

¶ 71                                                    CONCLUSION

¶ 72       For all the foregoing reasons, we reverse and remand for second-stage proceedings consistent with this opinion.

29

¶ 73          Reversed and remanded.

¶ 74          PRESIDING JUSTICE MIKVA, specially concurring:

¶ 75          I concur on the basis that, as outlined in paragraph 70, *supra,* Mr. Searles's petition makes a *prima facie* showing for an as-applied challenge under *People v. Harris*, 2018 IL 121932. A number of panels of this court have concluded that *Harris* provides cause for a young adult to make a successive postconviction claim that, at the time the crime was committed, he or she was the equivalent of a juvenile. See, *e.g., People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 89, *pet. for leave to appeal granted* (No. 127787, Oct. 26, 2021) and cases cited therein. Those same cases have found prejudice where, as in this case, there is some evidence to support the defendant's claim that he is the equivalent of a juvenile. *Id.*

¶ 76          We have rejected the argument, made by the State in this case, that language from our supreme court's decision in *People v. Dorsey,* 2021 IL 123010, eliminated such claims. See *People v. Vega*, 2022 IL App (1st) 200663-U (rejecting this argument); see also *Horshaw*, 2021 IL App (1st) 182047, ¶128 (rejecting the argument that *Dorsey* overruled the court's prior holding in *People v. Holman*, 2017 IL 120655, ¶ 40, that discretionary as well as mandatory life sentences may run afoul of youth-based constitutional protections).

¶ 77          In my view, *Dorsey*, which involved an eighth-amendment claim brought by a juvenile, rather than a young adult like Mr. Searles, has nothing to do with this case. Our supreme court held in *Dorsey* that, under *Miller v. Alabama,* 567 U.S. 460 (2012), and the eighth amendment, day-for-day credit must be considered in determining what qualifies as a *de facto* life sentence. *Dorsey*, 2021 IL 123010, ¶ 50. The court rejected the defendant's proportionate penalties claim based on both forfeiture and *res judicata* before going on to state: "Moreover, we find that *Miller*'s announcement of a new substantive rule under the eighth amendment does not

provide cause for a defendant to raise a claim under the proportionate penalties clause." 2021 IL 123010, ¶ 74. But the trigger for a claim of the sort advanced here by Mr. Searles was not the Supreme Court's decision in *Miller*. Rather, it was our own supreme court's statements years later in *People v. Thompson*, 2015 IL 118151, ¶ 44 and *Harris*, 2018 IL 121932, ¶ 48. In those cases, our supreme court announced for the first time that young adults are "not necessarily foreclosed" from raising youth-based proportionate penalties claims on an as-applied basis; this is what opened the door for individuals like Mr. Searles to make such claims. The *dicta* in *Dorsey* really does not address this issue.

¶ 78        JUSTICE MITCHELL, dissenting:

¶ 79        What constitutes "cause" sufficient to excuse a petitioner's failure to raise a claim in an earlier post-conviction petition? A petitioner "shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2018). Here the majority finds "cause" in a 2019 statute providing for parole review for persons who committed first degree murder while under 21, 730 ILCS 5/5-4.5-115 (b) (West 2020). Accordingly, the majority permits John Searles' successive collateral attack on his 75-year sentence to proceed based on a putative violation of the proportionate penalties clause of the Illinois Constitution. See Ill. Const. 1970 art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."). Because I conclude that Searles has failed to demonstrate cause, I respectfully dissent.

¶ 80        Under our cases, cause may include a subsequent change in law of constitutional dimension so significant that the substantive theory would have been effectively unavailable at the earlier date. See, *e.g.*, *People v. Davis*, 2014 IL 115595, ¶¶ 41-42 (a "new substantive

rule" of constitutional law "constitutes 'cause' because it was not available to counsel earlier"); *People v. Pitsonbarger*, 205 Ill. 2d 444, 461 (2002) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for failure to raise the claim ***."); accord *People v. Coleman*, 183 Ill. 2d 366, 380 (1998) ("[P]ost-conviction relief is limited to constitutional deprivations which occurred at the original trial."). "Cause-and-prejudice" sets a deliberately high bar that reflects a legislative judgment that strikes a balance between the need for finality and the need to vindicate constitutional rights. *Davis*, 2014 IL 115595, ¶¶ 13-14.

¶ 81    The 2019 parole review statute does not create any new constitutional theory: it merely provides that "a person under 21 years of age at the time of the commission of first degree murder *** shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences." 730 ILCS 5/5-4.5-115(b). Significantly, the 2019 parole review statute is prospective only and applies to defendants sentenced "on or after June 1, 2019." *Id.* The General Assembly actually considered a proposed bill that would have applied retroactively, but the bill enacted is prospective. Compare 100th Gen. Assemb., Senate Bill 2073, 2017 Sess., with Pub. Act 100-1182 (eff. Jun. 1, 2019). By its terms, the 2019 parole review statute has no application to Searles.

¶ 82    There was no impediment to Searles raising a proportionate penalties challenge before now. The proportionate penalties clause was then very much in existence, and Searles' age was a known fact. For over a century, Illinois courts have recognized that a defendant's youth is a relevant factor in sentencing: "[T]he habits and characters" of minors "are presumably, to a large extent, as yet unformed and unsettled." *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894).

¶ 83    Further, Searles actually did raise a proportionate penalties argument in the trial court at his sentencing:

> "[DEFENSE COUNSEL]: [W]hat we have is a young man who made a terrible mistake basically ending someone's life; that's a tragedy. But, the question I guess becomes is *** there *** hope for rehabilitation. Under the Illinois Constitution, that is something your Honor has to consider. I think there is.
>
> ***
>
> On the other hand, judge, a hundred or 75 or an extended term sentence to a 22-year-old man may be throwing away the key on him and *** I think there is some rehabilitative potential."

¶ 84    On direct appeal, Searles challenged his sentence as excessive and "that the trial court failed to take into account his age, lack of extensive criminal background, and that he had completed his G.E.D. in jail." *People v. Searles*, 346 Ill. App. 3d 1178 (2004) (Table) (unpublished order under Supreme Court Rule 23). We rejected these contentions and affirmed Searles's sentence. *Id*. As a consequence, much if not all of Searles' current challenge appears barred by *res judicata*. See *People v. Dorsey*, 2021 IL 123010, ¶ 70; *People v. Adams*, 338 Ill. App. 3d 471, 476 (2003) (all issues decided on direct appeal are *res judicata*). Therefore, I would affirm the trial court's order denying Searles leave to file a successive postconviction petition.[7]

---

[7] A final point: assistant state's attorneys are *always* present in criminal courtrooms when court is in session. See 55 ILCS 5/3-9005 (West 2020). There is nothing "troubling" about that. Ours are public courtrooms open to everyone—even prosecutors. Further, while the State has no role to play in deciding whether a petitioner should be granted leave to file a successive petition, *People v. Bailey*, 2017 IL 121450, ¶¶ 24-25, there is nothing to suggest that it had any input here. The record is completely devoid of any argument offered by the State. The able trial judge issued an 11-page scholarly order that carefully reviewed the relevant authorities.